JOHN N. SIMS, Respondent, v. THE MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

**Kansas City Court of Appeals, January 5, 1914.**

1. **CARRIERS OF LIVE STOCK: Damages: Care of Stock.** The plaintiff sued to recover damages for the negligent care by the defendant of 78 head of fat hogs, which he delivered to the defendant at Blackwater to be transported to the East St. Louis stockyards. The hogs arrived too late for the day's market and eight of them were dead. *Held*, that the demurrer to the evidence was properly overruled.

2. **COMMON CARRIERS: Contracts: Liability.** A common carrier cannot exempt himself from liability by contract for his own negligence or that of his servants, but a carrier may contract with the shipper for immunity from all other liability than that created by his tortious acts, or those of his servants.

3. ———: ———: **Written Notice.** A stipulation in a contract of shipment with a common carrier providing for the giving of speedy written notice of the loss is valid and enforceable. But when the defendant accepts the belated notice as one given in time and holds the claim for investigation until after the expiration of the agreed time for plaintiff to sue upon it, the defendant by such acts waives the benefit of those stipulations.

Appeal from Cooper Circuit Court.—*Hon. J. G. Slate, Judge.*

AFFIRMED.

*Roy D. Williams* for appellant.

(1) Plaintiff, for a valuable consideration, agreed to give notice within one day after the stock reached destination, of any claim he might have. This notice could have been given as readily within one day as within two days. This stipulation is valid and binding. McKinstrey v. Railroad, 153 Mo. App. 552; McElvain v. Railroad, 151 Mo. App. 141; Moore v.

Railroad, 143 Mo. App. 675; Shelton v. Railroad, 131 Mo. App. 560; Freeman v. Railroad, 118 Mo. App. 526; Merewether v. Railroad, 128 Mo. App. 291; Railroad v. Harriman, 227 U. S. 657. (2) The construction of the Carmack Amendment to the Hepburn Act has been put at rest by Express Co. v. Crutsinger, 226 U. S. 491, 33 Supt. Ct. 497; Railroad v. Carl, 227 U. S. 639; Railroad v. Harriman, 227 U. S. 657. (3) The construction of this law is a Federal question, and the opinion of the Supreme Court of the United States is binding and has been followed by our courts in Mfg. Co. v. Wabash, 156 S. W. 830; Joseph v. Railroad, 157 S. W. 837; McElwain v. Railroad, 158 S. W. 465.

*John Cosgrove* and *Daniel W. Cosgrove* for respondent.

(1) There was no reduced rate offered or given to respondent. There was nothing said about rates at all until after the hogs had been loaded and taken charge of by appellant. The rate mentioned in the contract was not the rate collected. It was the usual and customary rate charged to all shippers of hogs from Blackwater to National Stockyards. Regular and customary rates are not special tariff rates. Bescheer v. Railroad, 151 Mo. App. 80; McFadden v. Railroad, 92 Mo. 343; Moore v. Railroad, 143 Mo. App. 678. The appellant by its conduct, is not entitled to raise a Federal question on this record, nor is any ruling in this case contrary to the law as announced by the Supreme Court of the United States in Railroad v. Harriman, 227 U. S. 657, or the other cases of the Supreme Court of the United States.

JOHNSON, J.—On July 4, 1911, defendant, a common carrier, received seventy-eight fat hogs from plaintiff for transportation from Blackwater, Mo., to the National Stockyards at East St. Louis, Ill. The shipment left Blackwater in the afternoon and had the

transportation been accomplished in the usual time, would have arrived at the stockyards early the next morning in time for the market of that day but it did not arrive until eleven o'clock. Eight of the hogs were dead and the remainder could not be put on the market until the following day. Plaintiff alleged in his petition that the damages he sustained in consequence of the death of the eight hogs and of the injury to the others were caused by negligence of defendant, as follows: First, that the car containing the hogs was switched at Blackwater onto an inclined track leading to a coal chute and kept there several hours, with the result that the hogs piled up at the lower end of the car and became overheated; second, that defendant ran the hogs through to the stockyards without throwing water over them to cool them off, and, third, that they were negligently exposed to the sun (the weather was very hot) in the railroad yards at East St. Louis.

The answer pleaded compliance by defendant with the Interstate Commerce Act and amendments thereto and interposed a number of defenses based on the provisions of a written contract for the transportation.

The reply put the question of the validity of these provisions in issue and also pleaded a waiver. Plaintiff introduced evidence tending to prove the pleaded acts of negligence and their causal relation to the damage sustained by him. Defendant's evidence shows compliance with the requirements of the Interstate Commerce laws and that at the time of the shipment its tariffs were duly filed and posted. Further it was shown by defendant that before the shipment left Blackwater the parties entered into a written contract which recited: "That for the considerations and mutual covenants and conditions herein contained, the said first party will transport for the said second party the live stock described below, and the parties in charge thereof, as hereinafter provided, viz.: One

car, said to contain seventy-eight head of hogs consigned to Stewart, Son & McCormick, Nat'l Stock Yds., E. St. Louis, from Blackwater, Mo., station to destination if on this railway or its leased or operated lines, and there delivered to consignee, or to the proper junction, if the destination is on another road, and there deliver to a connecting carrier, at the rate of 17c per cwt., subject to minimum weights and length of cars provided for in tariff, said rate being less than the rate charged for shipments transported at carrier's risk, for which reduced rate and other considerations it is mutually agreed between the parties hereto as follows. . . . "

Then follow certain stipulations from which we quote: "Third: That the second party shall assume all risk and expense of feeding, watering, bedding and otherwise caring for the live stock covered by this contract while in cars, yards, pens, or elsewhere, and shall load and unload the same at his own expense and risk." . . . "Fifth: That as a condition precedent to the recovery of any damages for any loss or injury to live stock covered by this contract for any cause, including delays, the second party will give notice in writing of the claim therefor to some general officer or to the nearest station agent of the first party, or to the agent at destination or some general officer of the delivering line, before such stock is removed from the point of shipment or from the place of destination, and before such stock is mingled with other stock, such written notification to be served within one day after the delivery of the stock at destination, to the end that such claim may be fully and fairly investigated; and that a failure to comply with the provisions of this clause shall be a bar to the recovery of any and all such claims, and to any suit or action brought thereon." . . . "Eleventh: That no suit or action against the first party for loss, damage or delay to or of the live stock shipped under this contract shall be

sustainable in any court of law or equity, unless such suit or action is commenced within six months next after the cause of action shall occur; and should any suit or action be commenced against the first party after the expiration of six months, the lapse of time shall be constituted conclusive evidence against the validity of such claim, any Statute of Limitations to the contrary notwithstanding. Twelfth: That in making this contract, the undersigned owner, or other agent of the owner, of the stock named herein, expressly acknowledges that he has had the option of making this shipment under the tariff rates, either at carrier's risk or upon a limited liability, and that he has selected the rate and the liability named herein and expressly accepts and agrees to all the stipulations and conditions named herein.''

Further the contract provided that the rate stated in the opening paragraph applies only to shipments ''made at the owner's risk with limitation of liability on the part of the railroad company as common carrier'' and fixes a higher rate ''on shipments made without limitation of carrier's liability at common law.''

It appears that plaintiff did not notify defendant of his claim for damages until July 7, 1911, two days after the arrival of the hogs at the stockyards and further that this suit was not commenced until April 20, 1912. To meet the defenses urged by defendant that the notice was not given in the time stipulated in the third paragraph of the contract and that the suit was brought after the expiration of the time allotted in the eleventh paragraph, plaintiff introduced in evidence a letter dated April 2, 1912, sent by defendant to the agent of plaintiff, as follows:

''With reference to above claim filed by you on July 7th in favor of J. N. Sims, Blackwater, Mo., amounting to $87.23 on car hogs shipped from that point July 4, 1911, concerning which you have written

the undersigned and called at this office innumerable times.

"Our position in connection with this claim has not been made known to you, because you will remember that we lost original papers and you very kindly furnished us with a duplicate set and only recently has our investigation been completed.

"The unloading certificate you sent us shows hogs were unloaded at 11:40 a. m. on July 5th, and sold on that day's market. While the unloading at National Stockyards was somewhat late, we have developed that the car was at National Stockyards ready to be unloaded around 9 a. m., but on account of a congestion at your point, the unloading was not commenced until after 11 a. m. Doubtless you will recall that July 5th in point of receipts was a record breaker at National Stockyards, and the heavy receipts brought about this confusion and necessarily quite a number of cars were delayed and had to wait their turn at the landing. Added to this July 5th was one of the hottest days last summer, and nearly every car that arrived had from two to more dead hogs, the death of which was brought about by the excessive heat. There was absolutely no delay in the transportation between Blackwater and St. Louis and the delay with which hogs met at National Stockyards is, of course, chargeable to above condition.

"I wish to say that we have paid no claim for hogs or cattle delayed after they left our possession, as it was something over which we had no control, neither have we entertained claims for death of hogs in shipments made July 4th.

"In view of our good handling of shipment in question, do not see how it will be possible for us to admit of responsibility and under the circumstances, nothing remains for me to do but ask for cancellation of bill versus this company.

"I regret exceedingly that I was not in a position to advise you prior to this time, but as before stated, the papers were lost by us."

The court refused defendant's request for a peremptory instruction and submitted to the jury in appropriate instructions the issues of fact tendered by the petition. On the issue of waiver the court, at the request of plaintiff, instructed the jury that if they "shall believe from the evidence that the plaintiff, on the 7th day of July, 1911, gave notice in writing to the defendant of his claim for damage and loss for delay in shipment of said hogs, that is, the death of eight and shrinkage of others, and that defendant's agents received said notice without objection and investigated the same and held the same under advisement until April 2, 1912, and then rejected said claim on other grounds than that notice was not timely given, the said conduct of defendant was a waiver of the sufficiency of said notice.

"And you are further instructed that if the defendant accepted and received said notice and lost the papers accompanying said claim or notice and called on the plaintiff's agent for a duplicate of said notice and claim and that said agent furnished same to defendant, and that defendant held the same until said 2nd day of April, 1912, and that the plaintiff did not sue within six months after said loss, if any, occurred, in the belief that defendant would adjust and settle said claim, and that plaintiff did bring this suit within eighteen days after said claim was rejected, then defendant waived the terms of the contract requiring suit to be brought within six months after said damages accrued."

Thus instructed the jury returned a verdict for plaintiff and after its motion for a new trial was overruled, defendant appealed.

An objection to the competency of certain evidence introduced by plaintiff is urged in the brief of

counsel for defendant and is dismissed with the observation that the evidence was clearly admissible as tending to prove that eight of the hogs died in consequence of the alleged acts of negligence in their transportation.

We agree with defendant that this was an interstate shipment, falling within the purview of the Interstate Commerce Act and the amendments thereto and that the written contract entered into by the parties was supported by a valuable consideration and must be held binding upon plaintiff. It would be binding under the decisions of this State rendered before the recent decisions of the Supreme Court of the United States construing what is called the Carmack Amendment to the Interstate Commerce Act since our courts have recognized and applied the rule that a reduced rate would afford a sufficient consideration for stipulations in a shipping contract restrictive of the carrier's liability at common law. But the laws of this State relating to interstate shipments were superseded by the Interstate Commerce Act as finally amended and since that legislation now covers the entire field of interstate commerce, we must look to it for guidance and to the decisions of the Federal courts construing it.

Referring to the effect of the Carmack Amendment, the Supreme Court of the United States say in Adams Express Co. v. Croninger, 226 U. S. 1. c. 505: "That the legislation supersedes all the regulations and policies of a particular State upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all State regulations with reference to

it. Only the silence of Congress authorized the exer-
cise of the police power of the State upon the subject
of such contracts. But when Congress acted in such
a way as to manifest a purpose to exercise its con-
ceded authority, the regulating power of the State
ceased to exist. [Northern Pacific Ry. v. State of
Washington, 222 U. S. 370; Southern Railway v. Reid,
222 U. S. 424; Mondou v. Railroad, 223 U. S. 1.]''

To the same effect are the later cases of Railway
v. Carl, 227 U. S. 639, and M. K. & T. Ry. Co. v. Harri-
man, 227 U. S. 657. See also American Silver Mfg.
Co. v. Railroad, 156 S. W. 830; 174 Mo. App. 184;
Joseph v. Railroad, 157 S. W. 837, 175 Mo. App. 18;
McElwain v. Railway, 158 S. W. 465, 176 Mo. App. 379.

That the shipping contract in the present case was
valid and binding on both shipper and carrier under
the Federal Law is a proposition about which there
can be no doubt in view of the decisions of the Supreme
Court to which we have just referred. In Express
Company v. Croninger, the rule so often applied in
this State that forbids a common carrier from ex-
empting himself by contract from liability for his own
negligence or that of his servants is reaffirmed, but
the gist of the decision is that a carrier may contract
with the shipper for immunity from all other liability
than that created by his tortious acts or those of his
servants.

The stipulation in the fifth paragraph of the con-
tract providing for the giving of speedy written notice
of the loss was valid and enforceable (M. K. & T. Ry.
Co. v. Harriman, supra; McKinstrey v. Railway, 153
Mo. App. l. c. 552; Freeman v. Railway, 118 Mo. App.
526) and of agreements similar to that contained in
the eleventh paragraph, the Supreme Court say in the
decision last cited (227 U. S. l. c. 672) : ''The policy
of Statutes of Limitation is to encourage promptness
in the bringing of actions, that the parties shall not
suffer by loss of evidence from death or disappearance

of witnesses, destruction of documents or failure of memory. But there is nothing in the policy or object of such statutes which forbids the parties to an agreement to provide a shorter period, provided the time is not unreasonably short. That is a question of law for the determination of the court. Such stipulations have been sustained in insurance policies. [Riddlesbarger v. Hartford Insurance Co., 7 Wall. 386.] A stipulation that an express company should not be held liable unless claim was made within ninety days after a loss was held good in Express Co. v. Caldwell, 21 Wall. 264. Such limitations in bills of lading are very customary and have been upheld in a multitude of cases. We cite a few: Central Vermont Railroad v. Soper (1st C. C. A.), 85 Fed. Rep. 985; Cox v. Central Vermont Railroad, 170 Massachusetts, 129; North British, etc., Insurance Co. v. Central Vermont Railroad, 9 App. Div. (N. Y.) 5, aff'd 158 N. Y. 726. Before the Texas and Missouri statutes forbidding such special contracts, short limitations in bills of lading were held to be valid and enforceable. [McCarty & Gulf, etc., Ry., 79 Texas, 33; Thompson v. Chicago, etc., Ry., 22 Mo. App. 321. See cases to same effect cited in 6 Cyc. 508.] The provision requiring suit to be brought within ninety days is not unreasonable."

The failure of plaintiff to perform these stipulations in the time and manner stated would have precluded him from maintaining this action but for the conduct of defendant in accepting the belated notice as one given in time and in holding the claim for investigation until after the expiration of the agreed time for plaintiff to sue upon it. By such acts defendant waived the benefit of these stipulations. [Jones v. Railroad, 117 Mo. App. l. c. 527.]

It may be conceded that the broad purpose of the Interstate Commerce Act is to assure equality and to prevent all manner of discrimination and that carrier and shipper may not in any manner vary fixed rates to

meet the exigencies of a particular case. [American Silver Mfg. Co. v. Railroad, supra.] But however rigid the law may be on the subject of holding both carrier and shipper to the fixed rates, it does not go to the length of abrogating the well-settled rule that the performance by the shipper of stipulations of the character of those under consideration may be waived by the carrier. That rule cannot be said to impinge in any way upon the prime object of the law to destroy discrimination and all opportunity therefor and this being so the rule should be treated as still in force.

The demurrer to the evidence was properly overruled. In what we have said we have answered points made by defendant against the instructions. The judgment is affirmed.

All concur.